IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHARLES J. and CAROLYN B. PENLAND, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 22-62L |
| UNITED STATES OF AMERICA, | ) ) | Judge Matthew H. Solomson |
| Defendant. | ) ) | |

**CORRECTED**

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF SUMMARY JUDGMENT**

MARK F. (THOR) HEARNE, II
Timothy Belz
J. Matthew Belz
True North Law, LLC
112 South Hanley, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

*Counsel for the Landowners*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

THE PROCEDURAL BACKGROUND ............................................................................. 8

ARGUMENT ...................................................................................................................... 9

   **I.**   The text of these 1890 conveyances granted the railroad only a right-of-way easement for construction and operation of a railway line across these owners' land. ................................... 9

      1.   The grantor's intent determines the nature of the property interest conveyed. ........ 12

      2.   North Carolina public policy strongly disfavors the creation of fee estates in strips or "gores" of land and presumes that strips of land are easements for a specific purpose. .. 13

   **II.**   Under North Carolina law the only interest the railroad could acquire was a right-of-way easement. .................................................................................................................... 17

      3.   The Federal Circuit's *en banc* decision provides the analysis guiding this Court's interpretation of these conveyances. .................................................................................. 18

      4.   A "right-of-way" is an easement not title to the fee simple estate in the land itself. 22

      5.   The government wrongly argues a conveyance of a right-of-way must be interpreted as a conveyance of title to the fee simple estate in the land. ........................................... 25

CONCLUSION .................................................................................................................. 26

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Abercrombie v. Simmons*,
  81 P. 208 (Kan. 1905) ............................................................................................................ 27

*Arkansas Game & Fish Comm'n v. United States*,
  568 U.S. 23 (2012) ................................................................................................................. 12

*Armstrong v. United States*,
  364 U.S. 40 (1960) ............................................................................................................ 13, 33

*Atlanta, B&A Ry. Co. v. Coffee County*,
  110 S.E. 214 (Ga. 1921) ........................................................................................................ 27

*Beasley v. Aberdeen & Rockfish R. Co.*,
  59 S.E. 60 (N.C. 1907) .......................................................................................................... 27

*Behrens v. United States*,
  59 F.4th 1339 (Fed. Cir. 2023) .......................................................................................... 8, 29

*Boston Chamber of Commerce v. City of Boston*,
  217 U.S. 189 (1910) .......................................................................................................... 11, 32

*Bradley v. Crane*,
  94 N.E. 359 (NY Ct. App. 1911) ........................................................................................... 27

*Bright v. United States*,
  603 F.3d 1273 (Fed. Cir. 2010) ............................................................................................. 33

*Caquelin v. United States*,
  959 F.3d 1360 (Fed. Cir. 2020) ............................................................................................. 33

*Carpenter v. United States*,
  147 Fed. Cl. 643 (2020) (applying Vermont law) ................................................................. 27

*Castillo v. United States*,
  952 F.3d 1311 (Fed. Cir. 2020) ............................................................................................. 21

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) .................................................................................................... 10, 11, 13

Court of Florida reaffirmed the principle in *United States v. 16.33 Acres of Land in Dade County*,
  342 So.2d 476 (Fla. 1977) ..................................................................................................... 21

*Dessureau v. Maurice Memorials, Inc.*,
  132 Vt. 350, 318 A.2d 652 (1974) ......................................................................................... 25

*Ellamae Phillips Co. v. United States*,
  564 F.3d 1367 (Fed. Cir. 2009) ............................................................................................. 10

*Evans v. United States*,
  694 F.3d 1377 (Fed. Cir. 2012) ................................................................. 33

*First English Evangelical Lutheran Church of Glendale v. County of Lost Angeles*,
  482 U.S. 304 (1987) ................................................................................... 12

*Florida S. Ry. Co. v. Brown*,
  1 So. 512 (Fla. 1887) ................................................................................. 21

*Hash v. United States*,
  403 F.3d 1308 (Fed. Cir. 2005) ................................................................. 29

*Hill v. Western Vermont Railroad*,
  32 Vt. ................................................................................................... 26, 27

*Hippely v. United States*,
  173 Fed. Cl. 389 (2024) ............................................................................. 33

*Horne v. Department of Agriculture*,
  576 U.S. 350 (2015) ............................................................................. 10, 11

*Jackson v. United States*,
  135 Fed. Cl. 436 (2017) ............................................................................. 27

*Jacksonville R. & K.W. Ry. Co. v. Lockwood*,
  15 So. 327 (Fla. 1894) ............................................................................... 18

*Joslin Mfg. Co v. City of Providence*,
  262 U.S. (1923) ......................................................................................... 13

*Kansas City S. Ry. Co. v. Sandlin*,
  158 S.W. 857 (Mo. Ct. App. 1913) ............................................................ 27

*Knick v. Township of Scott*,
  139 S.Ct. 2162 (2019) ............................................................................... 12

*Krites*,
  222 N.C. 24 S.E.2d .................................................................................... 16

*Lackey v. Hamlet City Board of Education*,
  128 S.E.2d 806 (N.C. 1963) ...................................................................... 17

*Ladd I*), *Ladd v. United States*,
  713 F.3d 648 (Fed. Cir. 2013) ..................................................................... 8

*Ladd v. United States*,
  630 F.3d 1015 (Fed. Cir. 2010) ................................................................... 8

*Leo Sheep Co. v. United States*,
  440 U.S. 668 (1979) ........................................................................... 8, 9, 12

*Lucas v. South Carolina Coastal*,
  505 U.S. 1003 (1992) ................................................................................. 11

*Malone v. City of Toledo*,
  28 Ohio St. 643 (1876) .............................................................................. 27

*Marvin M. Brandt Revocable Trust v. United States*,
 572 U.S. 93 (2014) ................................................................................ 8, 9, 12

*Memmer v. United States*,
 50 F.4th 136 (Fed. Cir. 2022) ...................................................................... 33

*Mills v. United States*,
 147 Fed. Cl. 339 (2020) ................................................................................ 29

*Monongahela Navigation Co. v. United States*,
 148 U.S. 312 (1893) ................................................................................ 13, 32

*Naglee v. Alexandria & F.R. Co.*,
 3 S.E. 369 (Va. 1887) ................................................................................... 23

*Neider v. Shaw*,
 65 P.3d 525 (Idaho 2003) ............................................................................. 29

*Nerbonne, N.V. v. Florida Power Corporation*,
 692 So.2d 928 (Fla. Ct. App. 1997).............................................................. 29

*Page v. Heineberg*,
 40 Vt. 81 (1868) ........................................................................................... 27

*Paine v. Consumers' Forwarding & Storage*, Co.,
 71 F. 626 (6th Cir. 1895) .............................................................................. 19

*Penn Cent. Corp. v. U.S. R.R. Vest Corp.*,
 955 F.2d 1158 (7th Cir. 1992) ...................................................................... 20

*Pensacola & Atl. R.R. Co. v. Jackson*,
 21 Fla. 146 (1884) ........................................................................................ 18

*Preseault v. Interstate Commerce Comm'n*,
 494 U.S. 1 (1990) ...................................................................................... 7, 8

*Preseault v. United States*,
 100 F.3d 1525 ........................................................................................Passim

*Rawls v. Tallahassee Hotel, Co.*,
 31 So. 237 (Fla. 1894) .................................................................................. 20

*Robinson v. King*,
 314 S.E.2d 768 (1984)................................................................................... 16

*Rogers v. United States*,
 90 Fed. Cl. 418 (2009)................................................................................... 29

*San Diego Gas & Elec. Co.* v. *City of San Diego*,
 450 U.S. 621 (1981) ...................................................................................... 12

*Seaboard Air Line Rwy. v. United States*,
 261 U.S. 299 (1923) ...................................................................................... 13

*Seaboard Air Line Ry. Co. v. Knickerbocker*,
 94 So. 501 (Fla. 1922) .................................................................................. 18

*Seaboard Air Line Ry. v. Southern Inv. Co.*,
  44 So. 351 (Fla. 1907) ................................................................................ 20

*Servando Bldg. Co. v. Zimmerman*,
  91 So. 2d 289 (Fla. 1956) ............................................................................ 21

*Silver Springs, O&G R. Co. v. Van Ness*,
  34 So. 884 (Fla. 1903) ................................................................................. 21

*Smith v. Horn*,
  70 So. 435 (Fla. 1915) ................................................................................. 21

*St. Onge v. Day*,
  18 P. 278 (Colo. 1888)................................................................................. 27

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
  535 U.S. 302 (2002) .............................................................................. 12, 13

*Thomas v. Railroad Co.*,
  101 U.S. 71 (1879) ...................................................................................... 23

*Toews v. United States*,
  376 F.3d 1371 (Fed. Cir. 2004) ..................................................................... 8

*Trevarton v. South Dakota*,
  817 F.3d 1081 (8th Cir. 2016) ................................................................. 9, 11

*Triplett v. Williams*,
  63 S.E. 79 (N.C. 1908) ........................................................................... 15, 16

*Troy & Boston R.R. v. Potter*,
  42 Vt. 265 (1869) ............................................................................. 25, 26, 27

*United States Forest Service v. Cowpasture River Preservation Ass'n*,
  590 U.S. 604 (2020) ................................................................................. 9, 28

*United States v. General Motors Corp.*,
  323 U.S. 373 (1945) .................................................................................... 13

*United States v. Miller*,
  317 U.S. 369 (1943) .................................................................................... 13

*United States v. Petty Motor Co.*,
  327 U.S. 372 (1946) .................................................................................... 13

*United States v. Pewee Coal Co.*,
  341 U.S. 114 (1951) .................................................................................... 12

*Van Ness v. Royal Phosphate Co.*,
  53 So. 381 (Fla. 1910) ................................................................................. 21

*Vermilya v. Chicago, M & St. P.RR. Co.*,
  24 N.W. 234 (Iowa 1885)............................................................................ 27

*West Texas Utilities Co. v. Lee*,
  26 S.W.2d 457 (Tex. Ct. App. 1930)........................................................... 27

vi

*Whetsell v. Jernigan,*
   229 S.E.2d 183 (1976) ............................................................................................. 16

*Woodward Governor Co. v. City of Loves Park, Winnebago County*,
   82 N.E.2d 387 (Ill. App. Ct. 1948) ......................................................................... 27


Statutes


16 U.S.C. § 1247(d) ................................................................................................. 7, 8

N.C. Gen. Statute §39-1 (2024) ................................................................................ 31

### INTRODUCTION

In the 1890s the Hendersonville & Brevard Railway Telegraph and Telephone Company (the Railroad) wanted to build a 19.1-mile-long railway line between Henderson County and Pisgah Forest, Transylvania County in North Carolina. In pursuit of this objective, the Railroad surveyed a railway corridor and solicited and obtained conveyances from landowners granting the Railroad a right to construct and operate a railway line across the owners' land. A century and a half later this railway line was no longer needed, and the Hendersonville & Brevard Railway Telegraph and Telephone Company's successor railroad abandoned the railway corridor.

The eleven original conveyances by which these twelve Plaintiffs' predecessors-in-title granted the Railroad a right-of-way across their land are attached as **Exhibit 1**. See also ECF No. 51-1, Exhibits 1-13. These conveyances define that interest these present-day owners' predecessors-in-title granted the railroad. The explicit text of these documents, the context and purpose for which these documents were created and North Carolina law define the interest granted the Railroad. The Railroad's interest in the strip of land was a right-of-way to use a "strip of land…to locate, construct, operate and maintain a standard gauge railroad through said premises." The Railroad paid these owners' predecessors-in-title nominal consideration of only one dollar. **Exhibit 1**.

In *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 8 (1990) (*Preseault I*), the Supreme Court held,

> Section 8(d) of the amended Trails Act provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests.

Following *Preseault I*, the Federal Circuit sat *en banc* and held the federal government's invocation of the Trails Act was a *per se* taking of private property. *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996 (*en banc*)) (*Preseault II*).  This holding has been repeatedly affirmed in the decades since *Preseault II*.  See the Federal Circuit's subsequent decisions in *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) reh'g and reh'g *en banc* denied, (646 F.3d 910 (Fed. Cir. 2011)) (*Ladd I*), *Ladd v. United State*s, 713 F.3d 648 (Fed. Cir. 2013) (*Ladd II*), *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004), and *Behrens v. United States*, 59 F.4th 1339 (Fed. Cir. 2023).

Because the present-day landowners' predecessors-in-title granted the railroad only an easement for a railway right-of-way and that easement terminated when the railroad abandoned the railway line, these present-day owners, the Plaintiffs, held unencumbered title to the fee estate in the land. See *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93 (2014) and *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979).

The Board's order of June 28, 2021, invoking Section 8(d) of the Trails Act took these owners' private property.  The federal government must pay these owners "just compensation." The Fifth Amendment provides, "No person shall…be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation." When the federal government invokes Section 8(d) of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) (the Trails Act), the federal government takes private property in violation of the Fifth Amendment.

The text of the original conveyances, the purpose for which these conveyances were granted and settled North Carolina state property law these owners held title to the land and the federal government took these owners' property.

This Court should grant these North Carolina landowners' motion for summary judgment and order the federal government to pay these owners just compensation.

## BACKGROUND

In the 1890s landowners in Henderson and Transylvania County, North Carolina granted the Hendersonville & Brevard Railway Telegraph and Telephone Company a right-of-way across a strip of their land. See **Exhibit 1**. After a century and a half, this strip of land was no longer needed for a railroad. See Verified Notice of Exemption of Blue Ridge Southern Railroad, L.L.C., STB AB 1306X, filed April 7, 2021. See ECF No. 001-02 (Exhibit 1 to the Complaint) and in the Statement of Uncontroverted Facts.

Under North Carolina law and the text of the original conveyances the context in which these conveyances were drafted and executed, the Railroad was granted only an easement to operate a railway line across a strip of these owners' land. The right-of-way easement terminated and the Plaintiffs (the successors-in-title to the landowners that granted the railroad a right-of-way easement) held unencumbered fee simple title to the land across which the railroad right-of-way was once located. See *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93 (2014), *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979), *United States Forest Service v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020), and *Preseault II*.

On June 28, 2021, the federal Surface Transportation Board (the Board) invoked Section 8(d) of the Trails Act and encumbered these owners' and with a new easement for a public recreational trail and a possible future railroad. *Trevarton v. South Dakota*, 817 F.3d 1081 (8th Cir. 2016). See also, *Towes*, and *Preseault II*.

The federal government's imposition of this new public rail-trail easement is a *per se* taking of the owner's private property for which the federal government has a "categorical" constitutional

3

obligation to pay the owner "just compensation."  See *Horne v. Department of Agriculture*, 576

U.S. 350 (2015), *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021).

In *Preseault II,* the Federal Circuit held that the government's liability in Trails Act takings

is determined by a three-point analysis.

> (1) Who owns the strip of land involved, specifically, whether the railroad acquired
> only an easement or obtained a fee simple estate;
>
> (2) if the railroad acquired only an easement, were the terms of the easement limited
> to use for railroad purposes, or did they include future use as a public recreational
> trail (scope of the easement); and
>
> (3) even if the grant of the railroad's easement was broad enough to encompass a
> recreational trail, had this easement terminated prior to the alleged taking so that
> the property owner at the time held a fee simple unencumbered by the easement
> (abandonment of the easement).[1]

> *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009).[2]

The text of the original conveyances to the Railroad, the context and purpose for which the

original owners granted the Railroad these conveyances and North Carolina law demonstrate that

the railroad was only granted an easement for a railroad right-of-way and this easement terminated

when the railroad abandoned the railway line.  These owners held unencumbered title to the fee

estate in their land.  Thus, the Board's imposition of a new public rail-trail corridor across these

owners' land is a taking of private property for which the federal government must pay these

owners.

The history of this railroad corridor is  provided in the Statement of Uncontroverted Facts

and the filings with the Board.  But, in summary, the railway line was created in 1890.  And in

---

[1] The third point in this analysis arises *only* when the original railroad right-of-way easement
granted the railroad included a right for a non-railroad to use the land for a public recreational trail.

[2] Citing and summarizing the Federal Circuit's *en banc* decision in *Preseault II*, 100 F.3d at 1533.

4

2021 was no longer needed so it was abandoned.  But the Board invoked Section 8(d) of the Trails Act on June 28, 1921, to create a new public rail-trail corridor across these owners' land.

The Trails Act is a *per se* taking of private property for which the government has a "categorical" obligation to pay the landowner.  The Board's invocation of the Trails Act is a "direct appropriation of [the owner's reversionary] property, or the functional equivalent of a practical ouster of the owner's possession."  *Lucas v. South Carolina Coastal Comm'n*, 505 U.S. 1003, 1014 (1992).  The Trails Act imposes "a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the [landowners]."  *Preseault II*, 100 F.3d at 1550.  See also *Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016) ("as a matter of federal law it granted 'a new easement for a new use'" ... the 'new easement' [the trail-user] acquired under the Trails Act, [is] an interest which authorized [the trail-user] to use the Trail for Trails Act purposes.") (quoting *Preseault II*, 100 F.3d at 1550).

When the government "depriv[es] the owner of the right to possess, use and dispose of the property," and denies the owner's right to exclude others from his or her property the government has a "categorical" duty to compensate the owner.  *Horne v. Department of Agriculture*, 576 U.S. 350, 358 (2015).  Government action confiscating an owner's property or "practically oust[ing]" an owner from possession of his property is "perhaps the most serious form of invasion of an owner's property interest, depriving the owner of the right to possess, use and dispose of the property."  *Horne*, 576 U.S. at 360 (internal quotation omitted).  The Court explained the "the right to exclude is universally held to be a fundamental element of the property right and is one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Cedar Point Nursery*, 141 S.Ct. at 2072-73.

The Fifth Amendment requires the government to pay an owner for what the owner lost, not what the government gained.  *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189,

5

195 (1910) ("the question is, What has the owner lost?  Not, what has the taker gained?") (Holmes, J.).  The Fifth Amendment is self-executing.  *San Diego Gas & Elec. Co.* v. *City of San Diego*, 450 U.S. 621, 654 (1981).[3]  See also *Knick v. Township of Scott*, 139 S.Ct. 2162, 2172 (2019) ("because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time").[4]

In *Leo Sheep* the Supreme Court held that "this Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation."  440 U.S. at 687-88.  The Court reaffirmed this principle in *Brandt*, 572 U.S. at 110 ("We decline to endorse [the government's] stark change in position, especially given 'the special need for certainty and predictability where land titles are concerned.'") (quoting *Leo Sheep*, 440 U.S. at 687).[5]  Chief Justice Roberts, speaking for the Court, explained that "[u]nlike most possessory estates, easements...may be unilaterally terminated by abandonment, leaving the servient owner with a possessory estate unencumbered by the servitude.

---

[3] Dissenting opinion of Justice Brennan, which was later adopted by the Court in *First English Evangelical Lutheran Church of Glendale v. County of Lost Angeles*, 482 U.S. 304, 318 (1987).

[4] See also *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.") (citation omitted; citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)); *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).

[5] See also Garner, THE LAW OF JUDICIAL PRECEDENT, *supra*, p. 4 (internal quotations omitted), stating, "The rule-of-property doctrine...holds that stare decisis applies with peculiar force and strictness to decisions governing real property….  Stability in rules governing property interests is particularly important because those rules create unusually strong reliance interests….  As the Supreme Court explained in a mid-19th-century case:  Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open.  Such decisions become rules of property, and many titles may be injuriously affected by their change."

6

In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land."[6]

Paying an owner just compensation for the owner's private property is the predicate upon which the government's power of eminent domain rests.[7] *Cedar Point Nursery*, 141 S.Ct. at 2074 ("we have held that a physical appropriation is a taking whether it is permanent or temporary"). Chief Justice Roberts continued, "[o]ur cases establish that 'compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though that use is temporary.'" *Id*. (quoting *Tahoe-Sierra*, 535 U.S. at 322, and citing *United States v. General Motors Corp.*, 323 U.S. 373 (1945), and *United States v. Petty Motor Co*., 327 U.S. 372 (1946)).

The federal government didn't pay these owners for what the government took. The Constitution requires the government to not only pay these owners "just compensation" but to *promptly* pay owners. See *Joslin Mfg. Co v. City of Providence*, 262 U.S. 688 (1923), and the authorities discussed in my letter of January 3, 2024

---

[6] Citation omitted; quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES §1.2, Comment d, §7.4, Comments a, f.

[7] See, *e.g.*, *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893) ("The 'just compensation' is to be a full equivalent for the property taken. … [N]o private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner."); *United States v. Miller*, 317 U.S. 369, 373 (1943) ("The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."); *Seaboard Air Line Rwy. v. United States*, 261 U.S. 299, 304 (1923) ("The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken."); *Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

**THE PROCEDURAL BACKGROUND**

The Ecusta Trail and the Board's order invoking the Trails Act to take property for the creation of the Ecusta Trail took property from hundreds of North Carolina landowners. The twelve Plaintiffs that own the fourteen properties in this case are some of the owners of land taken for the Ecusta Trail. Other owners have brought claims for compensation in *Austin v. United States,* Case No. 21-cv-1520, *Dalla v. United States, Case No.* Case No. 22-cv-1676, *Bridges v. United States*, Case No. 22-cv-170, and *Gambill v. United States*, Case No. 25-cv-238. The government has acknowledged its constitutional obligation to pay many of these owns and the owners have been paid. But the government has chosen to contest its obligation to compensate other owners including these owners of the fourteen properties in this case.

Originally the government and owners agreed to resolve the compensation due these twelve owners by hiring Damon Bidencope to provide his opinion as to the value of the property the government took from each owner. Mr. Bidencope provided his opinion but, unknown to the Plaintiffs, when the government proposed Mr. Bidencope as a common appraiser the government had already hired Mr. Bidencope as its testifying expert in other Trails Act cases. Had the Plaintiffs known that Mr. Bidencope was the government's expert in other cases, the Plaintiffs would not have agreed to used Mr. Bidencope as a neutral appraiser in the settlement of this case.

Mr. Bidencope's opinion was provided as a "common appraiser" and the government and owners jointly agreed to provide Mr. Bidencope access to the property and information concerning the value of these properties. Neither the government nor the owners agreed to be bound by Mr. Bidencope's opinion. Mr. Bidencope was understood to be neutral to offer an opinion to assist in the negotiation of a settlement.

Mr. Bidencope provided his opinion in July and August 2024. The parties did not agree upon a settlement based upon Mr. Bidencope's appraisals. One owner, Diane Scott, did agree to

8

accept the compensation Mr. Bidencope proposed. The compensation due the owners of these other thirteen properties remain unresolved.

After the settlement discussions failed to produce a resolution to the compensation the government owes the remaining twelve property owners, the government filed a motion for summary judgment. ECF No. 43. This Court struck the government's initial motion for summary judgment. ECF No. 45. The government refiled the same motion, ECF No. 47, which this Court again struck, ECF No. 48. This is the landowners' response to the government's refiled motion for summary judgment, ECF No. 51, and a cross-motion for summary judgment on behalf of the landowners. The landowners also file a separate motion to exclude the government from using Damon Bidencope who was a mediation appraiser as the government's testifying expert.

**ARGUMENT**

**I.    The text of these 1890 conveyances granted the railroad only a right-of-way easement for construction and operation of a railway line across these owners' land.**

North Carolina law, like the law of every other state, provides that the pre-eminent principle governing the interpretation of a conveyance of property is the intent of the grantor. The railroad was only granted a right-of-way easement to operate a railway line across these owners' land. We begin with *Triplett v. Williams*, 63 S.E. 79 (N.C. 1908). This is the North Carolina Supreme Court decision defining the principles of deed construction that govern the property interest these 1890 conveyances granted the railroad. In *Triplett* the South Carolina Supreme Court held,

> [T]he common-law rule of construction,… has been followed in this state…a more liberal and enlightened rule of construction obtains which looks at the whole instrument, without reference to formal divisions in order to ascertain the intention of the parties, does not permit antiquated technicalities to override the plainly expressed intention of the grantor, and which does not regard as very material the part of the deed in which such intention is manifested. This is not only the decided trend of modern adjudication, but it is the legitimate and necessary result of legislation in this and other states…This is so, because it is the last expression of

9

the grantor as to the conveyance which must control the preceding expression…For the purpose of ascertaining the intention the entire instrument, the habendum, as when the premises, is to be considered.

The governing principles are these. *First,* the intent of the grantor governs and defines that property interest the grantor conveyed. *Second*, the grantor's intent is determined by the explicit text of the conveyance read as a whole.

In the years after *Triplett* the South Carolina Supreme Court and lower courts affirmed decisions and followed *a priori* principles. See for example, *Robinson v. King*, 314 S.E.2d 768, 771 (1984),

The current governing rule is as follows, In construing a conveyance executed after January 1, 1968, in which there are inconsistent clauses, the courts shall determine the effect of the instrument on the basis of the intent of the parties as it appears from all of the provisions of the instrument… The rules of construction applicable here are found in G.S. 39-1 and *Triplett v. Williams*, 149 N.C. 394, 63 S.E. 79 (1908).

and *Robinson* at 773-774, (The Court stated in *Krites*, *supra*, 222 N.C. at 682, 24 S.E.2d at 553:

The true test is to take all of the provisions together and in the case of an apparent repugnance, to adopt that construction which is most consonant with the intent of the deed; and it cannot be questions that this intent is not infrequently found in the later expressions of the instrument, and that they are sometimes of a character so impressive as to override the more formal technical expressions in which conveyances are sometimes couched…The reasons for adhering to the *Triplett* rule of construing the deed from the intent as conveyed in the entire instrument are ably...The General Assembly has required that deeds executed aft 1 January 1968 be construed according to the intent expressed in all provisions of the instrument. G.S. 39-1.1(a). This statute essentially codifies the *Triplett* rule of construction.

See also *Whetsell v. Jernigan,* 229 S.E.2d 183 (1976), in which the North Carolina Supreme Court held, "conveyances executed after January 1, 1968, in which there are inconsistent clauses shall be construed in accordance with statute so as to effectuate intent of the parties as it appears from all provisions in instrument" at 184. The Court continued and held that "By the passage of G.S. 39-1.1, it would appear that '[i]t is the legislative will that the intention of the grantor and not the technical words of the common law shall govern.'" *Triplett v. Williams*, *supra*, 149 N.C. at 398, 63 S.E. at 80. See also Comment, *4 Wake Forest Intra.L.Rev.* 132 (1968)") at 187.

10

In 1963 the North Carolina Supreme Court held in *Lackey v. Hamlet City Board of Education*, 128 S.E.2d 806 (N.C. 1963), that,

> In the interpretation of a deed, the intention of the grantor or grantors must be gathered from the whole instrument and every part thereof given effect, unless it contains conflicting provisions which are irreconcilable or a provision which is contrary to public policy or runs counter to some rule of law…to discovery the intention of the parties is now regarded as the chief essential in the construction of conveyances. The intention must be gathered from the whole instrument in conformity with established principles, and the division of the deed into formal parts is not permitted to prevail against such intention; for substance, not form is the object sought. If possible, effect must be given to every part of a deed, and no clause, if reasonable intendment can be found, shall be construed as meaningless…In the instant case, there can be no doubt about the intent of the grantors. The conveyance was made for a nominal consideration, and while the reverter clause was inartfully drawn and inserted immediately following the description in the deed, it must be construed to mean that the grantors intended that the land conveyed should revert to the grantors or their heirs if the property should be abandoned for school purposes.

We have provided this Court and quoted the text of these original conveyances in the statement of uncontroverted facts, that demonstrate these original landowners only intended to grant the railroad a right to construct and operate a railway line across the owner's land.

So how do we apply these established principles of deed construction and property law that North Carolina – as well as every other state – follow in the construction of the specific conveyances these plaintiffs' predecessors-in-title granted the railroad? We turn first to the text of the specific conveyances. There is only one conclusion. To wit: the original landowners granted the Railroad and Telephone Company an easement to construct and operate a railway line across their land. This is a right-of-way for the specific purpose of operating a railway line across a strip of land. Any other construction of these documents is patently ridiculous. When the railroad line was no longer necessary and was abandoned, the right-of-way easement terminated. See *Brandt Trust, Leo Sheep, Preseault I, Preseault II, Toews,* and *Behrens*.

11

When the federal government, through the edict of the Surface Transportation Board invoked Section 8(d) of the federal Trails Act and imposed a new public rail-trail corridor easement across these owners' land, it was a *per se* taking of these owners' private property for which the See also [restatement, Ely from our brief in ATS Ford and Sawyer Rd].

### 1.    The grantor's intent determines the nature of the property interest conveyed.

When these conveyances were drafted and executed in the early 1900s it was understood that, "upon general principles…a railroad company…could acquire no absolute fee-simple, but only the right to use the land for their purpose." 1 ISAAC F. REDFIELD, THE LAW OF RAILWAYS (1869), p. 255.  See also LEONARD A. JONES, A TREATISE ON THE LAW OF EASEMENTS §211 (1898), p. 178 ("[a] grant of a right of way to a railroad company is a grant of an easement merely, and the fee remains in the grantor").  See also, Ely, Jr., RAILROADS & AMERICAN LAW, pp. 197-98 (citing SIMEON F. BALDWIN, AMERICAN RAILROAD LAW (1904), p. 77).

The Supreme Court of Florida held a railroad's interest is only an easement.  See *Pensacola & Atl. R.R. Co. v. Jackson*, 21 Fla. 146, 148-49 (1884) (citing Edward L. Pierce, PIERCE ON RAILROADS (1881), and REDFIELD); *Jacksonville R. & K.W. Ry. Co. v. Lockwood*, 15 So. 327, 330 (Fla. 1894) ("The opinion in *Railroad Co. v. Jackson...*relies on PIERCE ON RAILROADS."); *Seaboard Air Line Ry. Co. v. Knickerbocker*, 94 So. 501, 501 (Fla. 1922) (citing ELLIOTT ON RAILROADS (2nd ed.)).

The presumption is that conveyances of strips of land for a railroad right-of-way are easements, not a conveyance of title to the land itself.  The RESTATEMENT OF THE LAW (THIRD): SERVITUDES provides at §2.2 that, "Conveyances of land described as a road or right of way, or stated to be for a depot, station, or other purpose related to transportation, often give rise to disputes… The fact that the consideration paid was less than the value of a fee-simple estate in the

12

land weighs strongly in favor of finding that an easement was intended. ... If the ambiguity cannot be resolved by reading the instrument as a whole, courts must resort to the circumstances surrounding the transaction and public-policy preferences in constructing the instrument." The RESTATEMENT continues:

> … the consideration paid, the narrowness of the parcel, and its location in relation to the remaining land of the grantor, may suggest that the parties intended conveyance of an easement...
>
> *The fact that the grantee is a railroad may also tend to indicate that the instrument should be construed to convey an easement only.* The narrowness of the parcel, the consideration paid, and the frequency with which railroad uses have been abandoned often lead to the conclusion that the grantor, as a reasonable person dealing with a railroad, intended to grant no more than an easement for the right of way, retaining ownership of the land. The fact that an amount approaching full value of the fee has been paid, however, does not necessarily lead to the conclusion that a fee was intended because an easement will also deprive the grantor of any ability to use the land for an indefinite period of time.

§2.2, pp. 69-70 (emphasis added).

The CFC's conclusion that the grantors of these seven voluntary conveyances intended to convey the railroad title to the fee simple estate in the strip of land is contrary to this authority.

2.  **North Carolina public policy strongly disfavors the creation of fee estates in strips or "gores" of land and presumes that strips of land are easements for a specific purpose.**

The strip and gone doctrine is a background principle of law that informs the interpretation of these conveyances. The common law has long disfavored the creation of fee estates in strips or gores of land used as rights of way. For example, in *Paine v. Consumers' Forwarding & Storage*, *Co.*, 71 F. 626, 629-30, 632 (6th Cir. 1895), then Judge Taft (later President and Chief Justice) held that the "existence of 'strips or gores' of land along the margin of non-navigable lakes, to which the title may be held in abeyance for indefinite periods of time, is as great an evil as are 'strips and gores' of land along highways or running streams. The litigation that may arise therefrom after long years…[is] vexatious…[P]ublic policy [seeks] to prevent this by a

13

construction that would carry the title to the center of a highway, running stream, or non-navigable lake that may be made a boundary of the lands." Judge Posner of the Seventh Circuit Court of Appeals explained the doctrine and applied it to a railroad's interest in a strip of land.

> The presumption is that a deed to a railroad or other right of way company…conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple… If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between the railroad and its neighbor…. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property – more, that is, than a right of way.

> *Penn Cent. Corp. v. U.S. R.R. Vest Corp.*, 955 F.2d 1158, 1160 (7th Cir. 1992).[8]

Traditional principles of property law favor the interpretation of conveyances of a strip of land to a railroad be interpreted as the grant of an easement for a right-of-way. THOMPSON ON REAL PROPERTY (2nd ed.) §60.03(a)(7)(iii), explains,

> Because rights of way grant a railroad exclusive use of a strip of land, courts have long divided over whether they should be considered fees simple or easements. Most courts have considered them to be easements, the decision often turning upon the language used in the grant…

> First, deeds prepared by the railroads are construed in favor of grantors of the land, and, second, where there is ambiguity in the deed, absence in a railroad-prepared deed or language specifying that conveyance of a strip of land is in fee simple will be evidence of parties' intent that the conveyance not be in fee simple. *The use of the term "right of way" generally suggests the creation of only an easement.*

> Courts first attempt to resolve ambiguity from within the four corners of the document and, failing that, look at outside circumstances... There is a presumption in many jurisdictions that the fee lies in the adjoining property, unless a grantor of that adjoining land has explicitly excepted the fee interest upon conveyance. (emphasis added.)

Florida follows the strip-and-gore doctrine. For example, in *Seaboard Air Line Ry. v. Southern Inv. Co.*, 44 So. 351, 353 (Fla. 1907) (citing and quoting *Rawls v. Tallahassee Hotel,*

---

[8] Citations omitted.

14

*Co.*, 31 So. 237 (Fla. 1894)), the Supreme Court of Florida noted its holdings that "the proprietor of lots abutting on a public street is presumed, in the absence of evidence to the contrary, to own soil to the center of the street." Florida Law provides that when a landowner grants a right-of-way across his or her land, the owner retains title to the land under the easement, and that when an owner conveys title to land abutting an easement or right-of-way, the conveyance includes title to the land under the right-of-way absent a clear intention to the contrary.  See *Smith v. Horn*, 70 So. 435, 436 (Fla. 1915); *Servando Bldg. Co. v. Zimmerman*, 91 So. 2d 289, 293 (Fla. 1956), and *Florida S. Ry. Co. v. Brown*, 1 So. 512, 513 (Fla. 1887).

In *Servando*, the Supreme Court of Florida found that a ten-foot-wide alley on a subdivision plat would serve no "practical use or service," and that an "isolated piece of land of such proportion could be of no use to anyone except owners of property it touched and persons dealing with them." 91 So. 2d at 293.  The Supreme Court of Florida reaffirmed the principle in *United States v. 16.33 Acres of Land in Dade County*, 342 So.2d 476,480 (Fla. 1977), holding that the owner of lots abutting road easements took title to the centerline of the easements.  See the Federal Circuit's decision in *Castillo v. United States*, 952 F.3d 1311 (Fed. Cir. 2020).

The Supreme Court of Florida also applied this doctrine in the context of railroads, holding, in *Silver Springs, O&G R. Co. v. Van Ness*, 34 So. 884 (Fla. 1903), and *Van Ness v. Royal Phosphate Co.*, 53 So. 381 (Fla. 1910), that a railroad running trains on a strip of land acquired an easement across that land, not title to the land itself.  If a railroad were to obtain title to the entire fee estate in the land, the mineral interests, as well as any and all other "sticks in the bundle" of rights that compose property, would be held by the railroad even though this was not the grantor's intent.

This limitation on a railroad's property interest in strips and gores of land is consistent with a railroad's lack of the need for any greater interest.

15

It could not be more explicit and emphatic that these owners' predecessors-in-title intended to grant only a right-of-way for a railroad line across their land. See, Statement of Uncontroverted Facts **Exhibits 2-A – 2K**, where the text of each conveyance is quoted.

The Wilson conveyance from G.H. Wilson, N.L. Osborne and others to the railroad provides:

> In consideration of the benefits to be by them derived from the construction of its railroad through their premises in said State and County particularly described as follows: being the tract of land in which they now live and adjoining lands of G.H. [H. or W.] Wilson, N. L. Osborne and others and of the sum of one Dollar to them in hand paid the receipt whereof is hereby acknowledged [Nan?] J. Wilson and J.A. Wilson, his wife, of said County do give, grant, bargain, sell, and convey to the Hendersonville and Brevard Railway Telegraph and Telephone Company and its successors forever a strip of land of sufficient width upon which to locate, construct, operate, and maintain a standard gauge railroad through said premises to be marked out by the engineer or engineers of said company placed in file with the office of the Clerk of said Transylvania County, as required by law such strip so marked out and indicated to be the land hereby conveyed. Provided that this deed shall be void unless said railroad company shall have constructed a railroad through said premises on or before the first day of January 1887. Witness our hands and…[balance of document not included].

All of the other conveyance documents are similar. All these documents provide that the railroad paid only a nominal consideration (a dollar) for the interest the landowners granted the railroad. All of these conveyances explicitly state the purpose of the conveyance of an interest in the strip of land was for the location and operation of a railway line across the owners' land.

To suggest (as the government now argues) that these original grantors intended to convey the railroad title to the fee simple estate in the strip of land across which the railroad built and operated a railway line is not only incredulous, it is a frankly stupid and frivolous argument. No authority would hold these documents conveyed the railroad title to the fee simple estate in the land.

16

**II.    Under North Carolina law the only interest the railroad could acquire was a right-of-way easement.**

A railroad corporation is a creature of state law and a railroad corporation's power and authority to acquire property, including especially property acquired through the exercise of eminent domain, is defined by the public purpose for which the railroad corporation was chartered. To wit: building and operating a railroad.  The Virginia Supreme Court explained in *Naglee v. Alexandria & F.R. Co.*, 3 S.E. 369, 370 (Va. 1887), that, "[railroad] corporations are created...to answer the public good...and cannot, therefore, by mere common-law authority, divest themselves by direct act of their capacity to discharge the duties to the public which devolve upon them".  In *Thomas v. Railroad Co.*, 101 U.S. 71, 83 (1879), the Supreme Court explained "that a [railroad company] cannot...alienate its franchise, or property acquired under the right of eminent domain or essential to the performance of its duty to the public, whether by sale, mortgage, or lease."

Professor Ely explained in RAILROADS & AMERICAN LAW, pp. 197-98, that,

> Prominent experts took the position that, absent statutory provisions expressly authorizing the taking of a fee simple, railroads should receive just an easement in land condemned for their use.  "It is certain, in this country, upon general principles," Redfield declared, "that a railway company, by virtue of their compulsory powers, in the taking lands, could acquire no absolute fee-simple, but only the right to use the land for their purposes."  Judicial decisions tended to adopt this line of analysis…

In the late 1800s and early 1900s, railroads used their eminent domain power and their monopoly control to abuse landowners and farmers that shipped produce to market using the railroad.  In response, states adopted laws to protect landowners. See *supra.*  The various state statutes provided that railroads may "cause such examinations and surveys for the proposed railroad…and for such purposes…to enter upon the lands…of any person for that purpose [and] to take and hold such voluntary grants of real estate…as shall be made to it to aid in the

17

construction, maintenance and accommodation of its road." But, the statute also provided that "the real estate received by voluntary grant shall be held and used for purposes of such grant only."

The railroad's power of eminent domain, however, was subject to limitations – for example a railroad corporation can only take private property "upon making due compensation according to law to private owners." North Carolina limited what a railroad acquired, providing that "the real estate received by condemnation or by condemnation or voluntary grant shall be held and used for purposes of such grant only." Thus, under section 2241, the nature of the railroad's interest in land taken by voluntary grant is determined by the nature of the railroad's public purpose and a railroad corporation did not need to acquire title to the fee estate to operate a railway line across a strip of land, a right-of-way easement was sufficient.

### 3. The Federal Circuit's *en banc* decision provides the analysis guiding this Court's interpretation of these conveyances.

The Federal Circuit analyzed the property interests of a railroad established by condemnation decree and voluntary conveyances in *Preseault II.* The Federal Circuit's *en banc* decision in *Preseault II* provides a thorough analysis of the relevant principles of property law and deed construction that guide the Federal Circuit in the interpretation of conveyances to railroads in the early 1900s.

In *Preseault II* the Federal Circuit considered the nature of a railroad's interest in three parcels (parcels A, B, and C) across which a railway line had been built in the early 1900s. Parcels A and B were land that had been owned by the Barker Estate. The railroad's interest in the Barker land was acquired by a Commissioner's Award, which, the Federal Circuit concluded, "confirms that the [railroad company]…for the purposes has entered upon and occupied lands owned by [the Barkers] described [by a metes and bounds description of the strip of land]." *Preseault II*, 100 F.3d at 1534.

18

Because the railroad in *Preseault II* acquired its interest in the Barker land by condemnation, the Federal Circuit easily concluded, "it is clear from the relevant documents and statutes that the actions of the Railroad in this case fall under well-established Vermont laws and procedures for acquisition of rights-of-ways by companies incorporated for railroad purposes." The Federal Circuit held, "[t]he taking pursuant to statutory authority, gave the railroad only an easement, not a fee, and upon abandonment, the property reverts to the former owner." (citing and quoting *Dessureau v. Maurice Memorials, Inc.*, 132 Vt. 350, 351, 318 A.2d 652 (1974), and *Troy & Boston R.R. v. Potter*, 42 Vt. 265, 274 (1869)).

The Federal Circuit explained:

> The Vermont cases are consistent in holding that, practically without regard to documentation and manner of acquisition, when a railroad for its purpose acquires an estate in land for laying Track and operating railroad equipment thereon, the estate acquired is no more than that needed for the purpose, and that typically means an easement, not a fee simple estate.

The Federal Circuit's holding that the railroad acquired only an easement in the Baker land and not title to the fee estate applies equally to the 1926 Condemnation Decree granted the Tampa Southern Railroad.

The third parcel the Federal Circuit considered in *Preseault II* was the conveyance from the Manwell family. The Federal Circuit described the Manwell deed as follows:

> The operative instrument is a warranty deed, dated August 2, 1899, from Frederick and Mary Manwell to the Railroad. The deed contains the usual habendum clause found in a warranty deed, and purports to convey the described strip of land to the grantee railroad "[t]o have and to hold the above granted and bargained premises ... unto it the said grantee, its successors and assigns forever, to its and their own proper use, benefit and behoof forever." The deed further warrants that the grantors have "a good, indefeasible estate, in fee simple, and have good right to bargain and sell the same in manner and form as above written...."

*Preseault II*, 100 F.3d at 1535.

19

The Federal Circuit continued, "In short, the deed appears to be the standard form used to convey a fee simple title from a grantor to a grantee. *But did it?*" *Preseault II* at 1535-36 (emphasis added). The Federal Circuit noted that "the deed was given following survey and location of the right-of-way." *Preseault II* at 1536. The Federal Circuit held that, "despite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement." After citing *Hill v. Western Vermont Railroad*, 32 Vt. at 68, and *Troy & Boston Railroad*, 42 Vt. at 274, the Federal Circuit held,

> Thus it is that a railroad that proceeds to acquire a right-of-way for its road acquires only that estate, typically an easement, necessary for its limited purposes, and that the act of survey and location is the operative determinant, and not the particular form of transfer, if any. Here the evidence is that the Railroad had obtained a survey and location of its right-of-way, after which the Manwell deed was executed confirming and memorializing the Railroad's action.

> On balance it would seem that consistent with the view expressed in *Hill*, the proceeding retained its eminent domain flavor, and the railroad acquired only that which it needed, an easement for its roadway. Nothing the Government points to or that we can find in the later cases would seem to undermine that view of the case.

*Preseault II.* at 1537.[9]

The Federal Circuit's analysis in *Preseault II* directs the Federal Circuit to reach the same conclusion here. Namely, that the 1926 Condemnation Decree and the seven voluntary conveyances granted the railroad an easement for a railroad right-of-way across a strip of the owner's land and that the owner and the owner's successors-in-title retained ownership of the fee simple estate in the land.

The principles of Vermont law in the early 1900s, upon which the Federal Circuit relied in *Preseault II* are indistinguishable from North Carolina law in the early 1890s. Indeed, the relevant law in both Vermont and North Carolina were identical in the 1890s and early 1900s. The leading

---

[9] Paragraph break added.

20

Vermont Supreme Court decisions upon which the Federal Circuit relied in *Preseault II – Hill* and *Troy* – were cited by the Federal Circuit and the courts of several states as authority for the proposition that railroads obtain only an easement in strips of land used for a railway line.[10]  In other words, the legal principles of Vermont law upon which the Federal Circuit relied in *Preseault II* were common to Florida and other states.

Not only that, Vermont Supreme Court Chief Justice Isaac Redfield, who authored the *Hill* decision relied upon by the Federal Circuit in *Preseault II*, also authored the nation's leading treatise on railroad law (See Isaac F. Redfield, THE LAW OF RAILWAYS (3rd ed. 1867)) that was referenced by many states as an authority on the interpretation of conveyances to a railroad. Furthermore, there is no statute or decision of any court in the early 1900s when these conveyances

---

[10] See, *e.g.*, *Jackson v. United States*, 135 Fed. Cl. 436, 457 (2017) ("Here, as in *Preseault II*, the governing state statute strongly supports an interpretation that the [railroad] form conveyances granted the railroad an easement, not a fee simple.") (applying Georgia law) (citing and quoting *Preseault II*, 100 F.3d at 1534-35, 1537, and *Hill*, 32 Vt. at 76); *Carpenter v. United States*, 147 Fed. Cl. 643, 653 (2020) (applying Vermont law) ("The [Vermont Supreme C]ourt [in *Hill*] found the [railroad] only had the power to exercise its eminent domain power to acquire easements.") (citing *Hill*, 32 Vt. at 74); *Page v. Heineberg*, 40 Vt. 81, 83 (1868) ("A deed of the fee of land for railway purposes, has been held to convey no attachable interest.") (citing *Hill*, 32 Vt. at 68, and Redfield, LAW OF RAILWAYS, v.1, p. 248); *West Texas Utilities Co. v. Lee*, 26 S.W.2d 457, 459 (Tex. Ct. App. 1930) ("a deed should be so interpreted as to give effect to the intention of the parties, and where the conveyance is made for a particular use it must of necessity carry the implication of such limitation upon the estate conveyed") (citing *Hill*, 32 Vt. at 74); *Abercrombie v. Simmons*, 81 P. 208, 210 (Kan. 1905) ("parties may by their contract create an estate less than a fee, or a right less in extent than that which the law authorizes the grantee to acquire") (citing *Hill*, 32 Vt. at 74); *Beasley v. Aberdeen & Rockfish R. Co.*, 59 S.E. 60, 62 (N.C. 1907) ("We have construed such grants of easements to railroads as conveying no more than may be reasonably within the contemplation of the parties.") (citing and quoting *Hill*, 32 Vt. at 68); *Bradley v. Crane*, 94 N.E. 359, 363 (NY Ct. App. 1911) ("No reason or purpose demanded or permitted that the city should take an estate greater than the opening and extending of the road compelled and superfluous thereto, which did not likewise demand that it take an excessive quantity of land.  In fact, excess of both land and interest or estate was by the conveyance forbidden it.") (citing *Hill*, 32 Vt. at 68); *Malone v. City of Toledo*, 28 Ohio St. 643, 651 (1876) ("under no circumstances, would the state take a fee simple absolute under this statute, but that at the best it would be a fee simple conditional or a fee simple determinable on condition") (citing *Hill*, 32 Vt. at 73); *Kansas City S. Ry. Co. v. Sandlin*, 158 S.W. 857, 858 (Mo. Ct. App. 1913) ("all such conveyances must be construed as passing an easement only to the grantee") (citing *Hill*, 32 Vt. at 74, and cases in West Virginia, Kansas, Michigan, Indiana, Iowa, North Carolina, and Ohio holding the same); *Atlanta, B&A Ry. Co. v. Coffee County*, 110 S.E. 214, 216 (Ga. 1921) (grantor "did not intend to vest in that company an absolute fee-simple title to the strip of land in controversy") (citing and quoting *Hill*, 32 Vt. at 74); *St. Onge v. Day*, 18 P. 278, 280 (Colo. 1888) ("It should not be inferred from what has been said that the railway company has right to burden the property with any other or different use than that for which it was granted or acquired.") (citing *Troy & Boston RR*, 42 Vt. at 274); *Woodward Governor Co. v. City of Loves Park, Winnebago County*, 82 N.E.2d 387, 390 (Ill. App. Ct. 1948) (citing and quoting *Troy & Boston RR*, 42 Vt. at 265); *Vermilya v. Chicago, M & St. P.RR. Co.*, 24 N.W. 234, 237 (Iowa 1885) (decisions of other states, including *Troy & Boston RR*, 42 Vt. at 265, "are in no manner in conflict with our views").

21

were drafted that suggests North Carolina adopted a different rule of law than that in Vermont (and all of the other states) that was the basis for the Federal Circuit's decision in *Preseault II*.

> **4.** **A "right-of-way" is an easement not title to the fee simple estate in the land itself.**

The ordinary-meaning rule applies to the interpretation of the voluntary conveyance documents as well as condemnation documents. The ordinary meaning of the word "*right-of-way*" is,

> The right to pass through property owned by another. A right-of-way may be established by contract, by longstanding usage, or by public authority (as with a highway). Cf. Easement. 2. The right to build and operate a railway line or a highway on land belonging to another, or the land so used. 4. The strip of land subject to a nonowner's right to pass through. – Also written right of way. Pl. rights-of-way.

> Bryan Garner, ed., BLACK'S LAW DICTIONARY (10th ed.).

In *United States Forest Service v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020), the Supreme Court considered the meaning of the term "right-of-way" *in a Trails Act case*. ("Generally, courts conclude that a conveyance of a "right-of-way" creates only an easement whether the grantee is an individual, a railroad, or another entity."). The Court explained,

> A right-of-way is a type of easement. In 1968, as now, principles of property law defined a right-of-way easement as granting a nonowner a limited privilege to "use the lands of another."…Specifically, a right-of-way grants the limited "right to pass…through the estate of another."…Courts at the time of the Trails Act enactment acknowledged that easements grant only nonpossessory rights of use limited to the purposes specified in the easement agreement…Thus, it was, and is, elementary that the grantor of the easement retains ownership over "*the land itself*." …Stated more plainly, easements are not land, they merely burden land that continues to be owned by another…

> 590 U.S. at 613 (citations omitted).

In *Brandt*, the Court similarly found that federal grants of a "right-of-way" under the General Railroad Right-of-Way Act of 1875 created easements not estates in fee. A conveyance of a "right-of-way" to a railroad means that the railroad gained only an easement for railroad

22

purposes.  In *Mills v. United States*, 147 Fed. Cl. 339, 347 (2020), Judge Bruggink explained, under Florida state law and the Federal Circuit's prior decisions in *Rogers*, "[i]t is incorrect...to assume that a grant to a railroad of a right-of-way in Florida is necessarily a fee.  We think the better view is that a 'right-of-way' for railroad purposes should be construed according to its natural meaning, *i.e.* '[t]he right to pass through property owned by another.'"[11]  Judge Bruggink's conclusion is consistent with Florida law on the subject. *Rogers v. United States*, 90 Fed. Cl. 418, 428-433 (2009), and *Nerbonne, N.V. v. Florida Power Corporation*, 692 So.2d 928, 928 n.1 (Fla. Ct. App. 1997).[12]

> BLACK'S LAW DICTIONARY defines an "easement" as follows:
>
> An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road).  The land benefiting from an easement is called the *dominant estate*; the land burdened by an easement is called the *servient estate*…an easement may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land.  The primary recognized easements are (1) a right-of-way....

THOMPSON ON REAL PROPERTY §60.02(a) explains,

> An easement is one of several ways in which one may obtain rights in the land of another...According to the 1944 RESTATEMENT OF PROPERTY, an easement is "an interest in land in the possession of another" that entitles the easement owner to "limited use or enjoyment" of that land … an easement "is the right to use the land of another for a specific purpose …
>
> The right in land held by an easement owner differs from the fee interest or even the leasehold interest in that it is a "use" interest, but not a "possessory" interest in the land. Thus the easement holder has neither the permanent possession of even a single molecule of the land itself...  Instead the easement holder has the right to make or control a particular use of the land that remains owned by another.

---

[11] Quoting "Right-of-Way," BLACK'S LAW DICTIONARY (11th ed. 2019).

[12] North Carolina is not unique in its construction of railroad conveyances as granting only a right-of-way easement. See *Hash v. United States*, 403 F.3d 1308, 1321 (Fed. Cir. 2005) (citing *Neider v. Shaw*, 65 P.3d 525, 530 (Idaho 2003)) (noting that "use of 'right-of-way' in the substantive part of the deed creates an easement").  Based on statutes similar or even identical to section 2241, other states have reached the same conclusion.  See *Behrens v. United States*, 59 F.4th 1339 (Fed. Cir. 2023).  A list of other state court decisions at Appx2184.

Terminological confusion arises from the non-possessory nature of the easement. That the interest is not possessory leads courts to say that it is not an *estate* in land, but an *interest* in land. A few courts, however, reintroduce the confusion between estates and interests in land by saying that the easement interest itself may be held in fee, even as a defeasible fee. Another court distinguishes ownership of land as an estate from an easement, which the court says, more resembles a claim or an encumbrance against the title to the land.

Bruce and Ely explain in THE LAW OF EASEMENTS AND LICENSES IN LAND §1:1.,

An easement is commonly defined as a nonpossessory interest in land of another…An easement is an acquired interest, not a natural incident of landownership… Easements are created expressly, implied in certain circumstances, established by prescriptive use, or obtained by estoppel, custom, public trust, or condemnation.

Distinguishing between an easement, a nonpossessory right to use land and fee ownership

of the estate in the land has bedeviled some courts. THOMPSON ON REAL PROPERTY explains,

In determining these disputes [between an easement or title to the fee estate], courts seek the intent of the parties in the language they used, the object of the arrangement, the identity, situation, and relation of the parties, and any other circumstances surrounding the transaction that provide indications of the parties' likely intent. Factors that may be significant in determining what the parties intended include the amount of consideration paid by the grantee, the size, shape and location of the parcel involved, its relation to other land owned by the parties, and the subsequent actions of the parties…

When the language of the instrument, read in the context of the transaction, does not definitely resolve the question of what the parties intended, courts may use a variety of constructional preferences and policy considerations to arrive at an appropriate construction of the instrument. Instruments may be construed against the party who had the greater opportunity to control the drafting, or against the party who had the greater sophistication in the type of transaction involved. Constructions may be favored that will avoid fragmenting land titles or splitting ownership into an odd-sized, uneconomic parcels. Instruments may be construed to avoid forfeitures or to avoid rewarding sharp practices….

The fact that the grantee is a railroad may also tend to indicate that the instrument should be construed to convey an easement only. The narrowness of the parcel, the consideration paid, and the frequency with which railroad uses have been abandoned often lead to the conclusion that the grantor, as a reasonable person dealing with a railroad, intended to grant no more than an easement for the right of way, retaining ownership of the land.

24

Bruce and Ely, *THOMPSON*, and the *RESTATEMENT* are authorities the Supreme Court frequently relies upon when deciding the property interest railroads obtained in land used for railway lines.

      **5.**      **The government wrongly argues a conveyance of a right-of-way must be interpreted as a conveyance of title to the fee simple estate in the land.**

The government wrongly claims that North Carolina law mandates that any conveyance concerning an interest in real property must be presumed to convey title to the fee simple estate. See government's motion ECF No. 51, p. 11 citing North Carolina Stat. §1280 (1883) and N.C. Statute N.C. Gen. Statute §39-1 (2024). Simply put. The government's argument is meritless and frivolous. These provisions of North Carolina law do not apply to *servitudes* such as easements. These provisions concern the construction of conveyances that apply to *estates* in land.

> The estate in fee simple absolute is transferred from one owner to another by any words that indicate the grantor's intent to make such a transfer. In times past, the phrase "and his heirs" was mandatory for a conveyance of an estate in fee simple absolute.…

*THOMPSON ON REAL PROPERTY* §71.01

In the late 1800s and early 1900s many states enacted model statutes to reform archaic conveyance language such as "heirs of the body" to simplify the conveyances of an estate in land. North Carolina's statute is very similar to model statutes adopted by other states at this time. The objective was to eliminate the use of archaic terms describing future interests in real property. The purpose for which North Carolina (and other states) adopted model statutes such as Section 1280 was to create a presumption of a fee simple estate as opposed to a future interests such as fee tail, remainder, contingent springing fee title, and other ancient forms of conveyances requiring magic words such as "the heirs of his" body used in the middle-ages as a form of estate planning by deed. The government invites this Court to error by arguing that this statute applies to conveyances of

25

*estates* in land to these voluntary conveyances granting *servitudes* to use the land for a railroad right-of-way.

If the government's view of North Carolina Section 1280 was every utility easement, road and utility right-of-way would transmogrify into a conveyance of the fee simple estate in the land. The government's contention disregards the foundational principle that the intent of the grantor governs the interpretation of a conveyance and is contrary to foundational principles of property law going back before Blackstone.

So too here. If the grantor of these voluntary conveyances intended to convey title to the fee simple absolute estate to the railroad, there would be no need to describe the land as a "right-of-way" for the explicit purpose of constructing and operating a railroad. The other features of these conveyances, the nominal consideration paid and the description by reference to an existing railroad line that had already been surveyed and located by the railroad, suggest that the grantor intended an easement. Simply put, no rational reading of the text of these documents can support the government's argument that the original grantors intended to convey the railroad title to the fee simple estate in the strip of land.

## CONCLUSION

These North Carolina owners did not want the federal government to take their property. But the federal government, by an edict of the Surface Transportation Board, took these owners' right to their land and imposed a public rail-trail corridor across these owners' land. So be it. The federal government has the power of eminent domain by which the federal government may take private property. But the federal government's power of eminent domain is constrained by the concomitant obligation to pay the owner "just compensation" that, as the Supreme Court has held, must place the owner in the same financial position as if the property had not been taken. See *Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893), *Boston Chamber of*

26

*Commerce v. City of Boston*, 217 U.S. 189 (1910), and *Armstrong v. United States*, 364 U.S. 40 (1960).

There can be no dispute about this constitutional principle. It is an *a priori* fundamental tenant upon which our Republic was founded. See Declaration of Independence and Constitution Article V. There is also no dispute about this Court's obligation to, as President Lincoln declared, "It is as much the duty of government to render prompt justice against itself, in favor of its citizens, as it is to administer the same, between private individuals."

Thus, the task before this Court is to render "prompt justice" for these North Carolina landowners.

The government argues these owners didn't really own their land. The government argues the conveyances from these owners' predecessors-in-title in the 1890s actually intended to convey to the railroad title to the fee simple estate in a strip of these owners' land.

As we explain above, the government's argument is contrary to all authority and the government is inviting this Court to issue a decision that would be reversable error. It is not just that the government's arguments are profoundly wrong to the point of being frivolous and sanctionable because they are without any merit.[13] Seriously, read the original conveyances. How

---

[13]The Federal Circuit and the Court of Federal Claims have rightly faulted the Justice Department's frivolous and foolish litigation strategy in past Trails Act cases. For example, in *Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010) and *Evans v. United States,* 694 F.3d 1377, 1380 - 79 (Fed. Cir. 2012) the Federal Circuit wrote:

> One might have supposed that the Government, having found itself mired in this messy litigation in three different courts, would readily accede to plaintiffs' proposal for a voluntary dismissal of the district court cases. This would get those cases laid to rest and permit the Government to concentrate its efforts on the merits of the Court of Federal Claims case. To so suppose would be a mistake. …

> The Government, however, foregoing the opportunity to minimize the waste both of its own and plaintiffs' litigation resources, not to mention that of scarce judicial resources, opposed plaintiffs' motions to stay, insisting that the district court suits

27

proceed despite the pending appeal. …

And even more puzzling is why the Government, after Bright was decided, pursued the course it chose in the district courts and in this appeal, seeking with every possible argument—even if so thin as to border on the frivolous—to avoid acquiescing in plaintiffs' effort to have the district court judgments put aside and to proceed on the merits in the Court of Federal Claims.

*Evans* 694 at 1379-138.[13]

Recently, in *Hippely v. United States*, 173 Fed. Cl. 389 (2024), Judge Holte held:

[I]t is incumbent upon the Court and government counsel before it—who work for the American taxpayer—to exercise sound prudence in that administration, especially when government liability may result in the additional payment of plaintiffs' attorneys' fees. In the words of President Thomas Jefferson five decades before Lincoln's address: "The same prudence which in private life would forbid our paying our own money for unexplained projects, forbids it in the dispensation of the public monies." Letter from President Thomas Jefferson to Skelton Gilliam (Jun. 19, 1808) (on file with The United States National Archives and Records Administration). In sum, the Court must not pay public money except as necessary to "render prompt justice" against the United States, and— relatedly—government counsel, like private attorneys accountable to clients, must balance the benefits of winning each case or issue with the eventual public taxpayer costs associated therewith. (emphasis added.)

Judge Holte continued:

Here, plaintiffs' counsel requests reimbursement in the amount of $396,312 in fees and $22,643.47 in costs for their work recovering $1,869.09 for their clients. Although this fee-to-client recovery ratio (~$212 to $1) may seem staggering, the government has recently paid more than $1,000,000 in fees in cases with similarly low recoveries. See *Caquelin v. United States*, 959 F.3d 1360, 1362 (Fed. Cir. 2020) (noting the "parties stipulated to compensation of $900"); (explaining "[t]he government paid $1,000,000 in legal fees in *Caquelin* when $900 of damages were at issue"); *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022); ("[T]he government has agreed to a settlement of $1.7 million in fees and costs in *Memmer* [ ] when $29,000 in damages were at issue."). …

[T]he Court reminds government counsel once more that it—in working for the American people and their tax dollars—must practice similar restraint when it comes to litigation decisions in these cases.

Government counsel should always factor in the cost of fees when litigating, much as would a private litigator representing a private client—weighing the costs of each pyrrhic victory with the benefits of quickly and efficiently resolving each case.

28

anyone can contend these original landowners intended to grant the railroad anything more than a right-of-way to construct and operate a railway line across a defined strip of the owner's land is simply incomprehensible.   It is not that the government's argument is factually false.   The government's argument is stupid.  The bigger issue is why has the government made this argument.

Respectfully submitted,

/s/ Mark F. (Thor) Hearne, II
MARK F. (THOR) HEARNE, II
Timothy Belz
J. Matthew Belz
True North Law, LLC
112 South Hanley, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

Counsel for the Landowners

---

173 Fed. Cl.at 399.

29